**Wayne TUCKER and Elna Tucker, Plaintiffs,**

v.

**AQUA YACHT HARBOR CORP., Chrysler Motor Corp., and Aluminum Cruisers, Inc., Defendants.**

**No. DC89–W114–S–O.**

United States District Court, N.D. Mississippi, Delta Division.

Oct. 24, 1990.

Michael Lewis, Luckett Law Firm, P.A., Clarksdale, Miss., for plaintiffs.

Ben L. Riddick, S. Craig Panter, Kirkland, Barfield & Panter, Jackson, Miss., for defendant Chrysler Motor Corp.

David R. Hunt, Ross, Hunt, Spell & Ross, Clarksdale, Miss., for defendant Aluminum Cruisers, Inc.

James L. Messenger, Henderson, Covington, Stein, Donchess & Messenger, Youngstown, Ohio, for defendant Aluminum Cruisers, Inc.

James W. Surprise, Johnson, Grusin & Kee, P.C., Memphis, Tenn., for defendant Aqua Yacht Harbor Corp.

Dan W. Webb, Shuttleworth, Smith & Webb, Tupelo, Miss., for defendant Aqua Yacht Harbor Corp.

## OPINION

SENTER, Chief Judge.

This case involves allegations that all defendants breached express and implied warranties and violated the Magnuson–Moss Warranty Act in connection with plaintiffs' purchase of a boat. Plaintiffs also allege tortious conduct on the part of defendant Aluminum Cruisers. Plaintiffs seek to revoke their acceptance of the boat and to recover its purchase price and other damages, including punitive damages from Aluminum Cruisers. This cause is now before the court on a motion for summary judgment filed solely by defendant Chrysler.

## FACTS

### I.

On June 18, 1988, the Tuckers purchased a boat from Aqua Yacht in Iuka, Mississippi, for $93,920.00, less a trade-in allowance on another boat and a cash downpayment. Aluminum Cruisers manufactured the boat itself; Chrysler manufactured and supplied the two marine engines which Aluminum Cruisers installed in the boat. From Chrysler, plaintiffs received a written warranty which provided that the engines would be free "from defects in material and workmanship under normal use and service" for one year or three hundred hours, whichever occurred first. During the warranty period, Chrysler expressly agreed to

> repair or replace at its factory or its authorized repair facility any part or parts of such products returned to it (with transportation charges pre-paid) which its examination shall disclose to its satisfaction to have been thus defective—provided it receives written notice of any such claimed defect within thirty (30) days from the date of discovery.[1]

1. This warranty constitutes an express warranty under section 75–2–313 of the Mississippi Code and a limited warranty under the Magnuson–Moss Warranty Act found at 15 U.S.C. §§ 2301–2312. The warranty was clearly designated as a limited warranty as required by 15 U.S.C. § 2303, which defines a limited warranty as one which does not meet the federal minimum guidelines enumerated in section 2304(a). The instant warranty does not meet those minimum standards.

   In response to the summary judgment motion, plaintiffs contend that the instant warranty "clearly" violates Magnuson–Moss. The basis of the alleged violation is not explicitly stated by plaintiffs, but the gist of the argument is as follows: Magnuson–Moss mandates that a warrantor may impose on a consumer only "notification" of a problem; because Chrysler requires "written notice" of any engine problems, the company has violated the federal warranty act.

   This issue plays no role in the court's disposition of the present motion. Nevertheless, plaintiffs' argument is without merit since the imposition on a consumer of something other than "notification" of a problem is violative of Magnuson–Moss only if the warranty is a "full" warranty. 15 U.S.C. § 2304(b)(1). The Chrysler warranty at issue is certainly not a full warranty.

   Two implied warranties also attach to these engines: (1) an implied warranty of merchantability (Miss.Code Ann. § 75–2–314); and (2) an implied warranty of fitness for a particular purpose (Miss.Code Ann. § 75–2–315). Neither of these implied warranties may be limited or disclaimed for the duration of the limited warranty. 15 U.S.C. § 2308; Miss.Code Ann. § 11–7–18 and § 75–2–719(4). *See Guerdon Industries, Inc. v. Gentry,* 531 So.2d 1202, 1205 (Miss.1988).

The Tuckers took delivery of the boat on the date of purchase and returned to their home in Alabama. For the next seven to eight weeks, they used the boat without complaint. Then, on August 6, 1988, plaintiffs took the boat on an extended trip to Chattanooga. During the return trip, plaintiffs noticed an oil leak in the starboard engine which Mr. Tucker promptly reported to Eddie Trimble at Aqua Yacht. Mr. Trimble recommended that plaintiffs bring the boat in for repairs, but they declined to do so because the oil was "just dripping" and was, at that time, nothing to be concerned about.

On August 22, Aqua Yacht sent two of its employees to Huntsville to examine the boat. They were unable to fix the leak, and in September, plaintiffs took the boat to Aqua Yacht's Iuka facilities. At that time, Aqua Yacht "pulled" both engines and installed new oil seals; the engines were then tested and reinstalled.

Plaintiffs experienced no further oil leakage problems until February, 1989, when the starboard engine again began leaking oil. On February 4, Mr. Tucker informed Mr. Trimble by letter of this problem, and on February 27, plaintiffs redelivered the boat to Aqua Yacht for additional repairs. At this time, plaintiffs lodged the following complaints about the starboard engine: (1) it leaked oil, (2) it did not run smoothly, and (3) it consumed 30 percent more gas than the port engine.

Approximately a week later, plaintiffs retrieved the boat from Aqua Yacht. Unsatisfied with the performance of the engines, Mr. Tucker again wrote Mr. Trimble, charging that "the engine is still not operating properly and something must be done about it."

On April 25, 1989, plaintiffs noticed a drop in the oil pressure on the port engine. Because it was knocking and would not idle down, Mr. Tucker cut off the engine and subsequently contacted Aqua Yacht. He was told to bring the boat in for repairs using only the starboard engine. On May 3, Mr. Tucker began the trip to Iuka, but, after he was approximately three miles from the dock, he heard a loud noise from the starboard engine and saw blue smoke; he returned to the dock.

A few days later, Mr. Tucker wrote directly to Aluminum Cruisers, Aqua Yacht, and Chrysler regarding the problems with the engines. On May 10, 1989, a Mr. Humme from Chrysler contacted Mr. Tucker and assured him that the engines would be repaired or replaced, to which Mr. Tucker responded that replacement was the "only acceptable cure."

Plaintiffs were instructed to deliver the boat to Wholesale Marine, Inc. in Huntsville. Wholesale was to remove the engines and determine the cause of the problems. Plaintiffs delivered the boat as directed, and, on May 24, Wholesale discovered that the pistons were the source of the engines' troubles. Within two days, Chrysler shipped two new engine blocks to Wholesale for installation in plaintiffs' boat. The engines arrived six days later. According to its records, Wholesale reassembled the non-defective parts on the new engine blocks on June 8, 9, 12, and 13; and on June 28, 1989, Wholesale completed the installation of the engines. However, in the interim—June 15 to be exact—plaintiffs commenced their suit before this court.

Although plaintiffs had filed suit and revoked their acceptance, Mr. Tucker nevertheless carried the boat out overnight the day after the new engines were installed. On September 8, 1989, Mr. Tucker returned the boat to Aqua Yacht and left it, simply saying, "Here's the boat." He noted that the new engines "seemed to function properly"; yet, he also stated that they leaked oil during this trip, but that the oil leak was not severe enough to require him to put any oil in the engines.

## II.

In its answer to plaintiffs' complaint, Aqua Yacht cross-claimed against Chrysler and Aluminum Cruisers, contending that it was merely the retailer of the boat, and that if it were liable to the Tuckers on any theory of breach of warranty, it would be entitled to indemnity from Chrysler, as the manufacturer of the marine engines, and Aluminum Cruisers, as the manufacturer

of the boat. Subsequently, Chrysler cross-claimed against Aqua Yacht, arguing that it might be entitled to indemnity from Aqua Yacht in light of the Tuckers' allegations that Aqua Yacht failed properly to repair the boat engines.

Chrysler now seeks summary relief as to all claims asserted against it (1) in the amended complaint and (2) in Aqua Yacht's cross-claim. Chrysler argues that plaintiffs' claims for breach of express and implied warranties fail as a matter of law, and therefore, if it is absolved of such liability, then it is entitled to relief on Aqua Yacht's cross-claim for indemnity as well.

## DISCUSSION

### I.

Chrysler contends that summary disposition of this case is appropriate not only because it honored each of its obligations under the express and implied warranties, but also because it was entitled to a reasonable opportunity to cure any defects in the marine engines in plaintiffs' boat. Chrysler relies on *Fitzner Pontiac–Buick–Cadillac, Inc. v. Smith*, 523 So.2d 324 (Miss.1988) and 15 U.S.C. § 2310(e) for the proposition that a seller must be afforded a reasonable opportunity to cure any defects in goods accepted by a buyer.

In response, plaintiffs do not refute Chrysler's argument that it was entitled to a reasonable opportunity to cure, nor could they do so under the applicable law. Rather, plaintiffs contend that the question of whether Chrysler was given a reasonable opportunity to cure is a question of fact which precludes the granting of summary judgment. Plaintiffs argue that Chrysler was afforded three opportunities to repair the boat and that "[a] jury could ... reasonably find that Chrysler's authorized factory representative did not use reasonable means to timely repair and replace the engines."

With these opposing positions drawn, the court is now in a position to address the only issue which is properly before the court, i.e., whether Chrysler has established as a matter of law that it was not given a reasonable opportunity to cure before plaintiffs revoked acceptance.

### II.

Plaintiffs have not sought to reject their acceptance of the boat under section 75–2–508 of the Mississippi Code but rather have attempted to revoke that acceptance under section 75–2–608. Noticeably absent from section 75–2–608 is any mention of a seller's right to cure following the buyer's revocation. Although a seller seems to have the right to cure only when the buyer rejects goods, the Mississippi Supreme Court, by analogy to 75–2–508 and as a matter of public policy, has determined that before a buyer may revoke acceptance under 75–2–608, the seller must be afforded a reasonable opportunity to cure, even though there may have been a breach of an implied warranty. *Fitzner Pontiac–Buick–Cadillac, Inc. v. Smith*, 523 So.2d 324, 325 (Miss.1988). In reaching this conclusion, the court stated:

> We recognize that a strict reading of the cure provisions of Miss.Code Ann. § 75–2–508 (1972) reveals no explicit application to [a] revocation situation.... The law's policy of minimization of economic waste strongly supports recognition of a reasonable opportunity for cure. Though the express language of Section 75–2–508 does not apply here, cure is not excluded by Section 75–2–608.

*Id.* at 328 n. 1.

Federal law also provides for a similar right of cure: an action for breach of express or implied warranty may not be brought under Magnuson–Moss "unless the person obligated under the warranty ... is afforded a reasonable opportunity to cure such failure to comply." 15 U.S.C. § 2310(e). *See Royal Lincoln–Mercury Sales, Inc. v. Wallace*, 415 So.2d 1024, 1027 (Miss.1982) (alleged breach of warranty can form basis of action under applicable sections of UCC and under Magnuson–Moss).

The "reasonable opportunity to cure" language which is employed by the Mississippi Supreme Court to determine compliance with the revocation statute does not appear in the statute itself. It is the

phrase expressly utilized in Magnuson–Moss, but none of these sources offers any insight into its meaning. However, the terms "reasonable time," which is used in section 75–2–508, and "seasonably," which is used in both 75–2–508 and 75–2–608, are defined: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action," Miss.Code Ann. § 75–1–204(2); "[a]n action is taken 'seasonably' when it is taken at or within ... a reasonable time." *Id.* at § 75–1–204(3).

Although the seller has a right to effect cure in the context of a buyer's revocation, that right is not boundless. *Guerdon Industries, Inc. v. Gentry*, 531 So.2d 1202, 1208 (Miss.1988). As oft quoted,

> [T]he seller does not have an unlimited time for the performance of the obligation to replace and repair parts. The buyer ... is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty.

*Orange Motors of Coral Gables, Inc. v. Dade County Dairies, Inc.*, 258 So.2d 319, 320–21 (Fla.Dist.Ct.App.1972). *See Rester v. Morrow*, 491 So.2d 204 (Miss.1986) (quoting *Orange Motors* and stating, "There comes a time when enough is enough— when a[ ] ... purchaser ... is entitled to say, 'That's all,' and revoke, notwithstanding the seller's repeated good faith efforts [to repair]'').

Plaintiffs do not rely on Mississippi law for the proposition that the law of this state requires this case to be submitted to a jury. *See Royal Lincoln*, 415 So.2d at 1027 (in applying Magnuson–Moss, whether seller has been given a reasonable opportunity to cure is fact question which is "properly left for the jury's determination under correct instructions"). Instead, they present their argument in the familiar terms of Rule 56 of the Federal Rules of Civil Procedure. In any event, this court is governed by a federal standard, and if the evidence before the court is such that a reasonable jury could not return a verdict for the nonmovant, then summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On summary judgment, the role of the court is to determine if there is a genuine issue for trial, i.e., whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

Essentially, the basic facts are undisputed in this case: (1) on two separate occasions, Aqua Yacht tried to repair the starboard engine; (2) when both engines failed, Chrysler offered to replace the engines as Mr. Tucker requested; (3) before the engines could be repaired by Wholesale Marine, plaintiffs instituted suit. Plaintiffs' complaint against Chrysler now seems to be not that it did not fix the engines but that it did not "timely" repair them.

Yet, according to Mr. Tucker's own deposition testimony, there were two specific reasons why Wholesale was delayed in making the necessary repairs to the engines in question. First, Mr. Tucker stated that the water in the Huntsville area rose during June to the point that Wholesale was unable to reach plaintiffs' boat to replace the engines. In fact, for about two to three weeks, the water was so high that it was impossible for Wholesale even to travel down the road to get to the boat. Second, Mr. Tucker charged that certain necessary parts—the gaskets—were not sent with the new engine blocks, thus leading to further delay.

In response to the motion for summary judgment, plaintiffs submit Mr. Tucker's affidavit wherein he attempts to explain how Chrysler and Wholesale Marine could have overcome these two obstacles and proceeded with the repair of his boat. Initially, Mr. Tucker proposes various ways in which Wholesale Marine could have surmounted the high water problem since "[i]t is reasonably foreseeable in the Huntsville ... area that the Tennessee Tombigbee Waterway will experience a water level fluctuation of 20 feet during the spring months." For example, Mr. Tucker suggests that Wholesale could have "trailered" the boat to its shop and replaced the en-

gines there, or it could have replaced the engines when the water receded in late May and early June. Next, he charges that Chrysler and Wholesale Marine did not take "any steps whatsoever in expediting receipt of the gaskets." He maintains that they could have easily procured the missing gaskets since "[t]he Chrysler Engines in this boat are quite common and the oil gaskets necessary to reassemble an engine are readily available and can be shipped anywhere across the continental United States overnight."

Although Mr. Tucker's theories are not disingenuous, his affidavit fails to meet the basic requirement of Rule 56(e), i.e., that the affidavit be made on personal knowledge. Fed.R.Civ.P. 56(e). Mr. Tucker offers no basis, except hindsight, for his opinions regarding how Chrysler and Wholesale could have more quickly repaired the engines. He does not, for example, indicate that he made these suggestions to the appropriate persons at the time the repairs were taking place. Further, these theories were not divulged in his lengthy deposition. Consequently, the court finds that Chrysler's argument that the affidavit "is insufficient to create any issue of fact on this matter" is well taken.

The phrase "reasonable opportunity to cure" is necessarily a flexible one, and its meaning is dependent on the facts and circumstances of each case. Even when "all justifiable inferences" are drawn in favor of the plaintiffs as the nonmoving party, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, the court finds that only one conclusion can be reached: Chrysler was not afforded a reasonable opportunity to cure before plaintiffs revoked acceptance. Once Wholesale Marine determined the cause of the problems with the subject engines, Chrysler shipped two new replacements. Less than twenty business days then elapsed between the time Wholesale received the new engines and the final repairs were performed; less than ten business days elapsed before plaintiffs filed suit. No reasonable juror could conclude, under these facts and circumstances, that filing suit while repairs were ongoing afforded Chrysler a reasonable opportunity to cure.

This is not a case in which the seller unsuccessfully attempted to repair the goods thirty times in a one-year period, *Tiger Motor Co. v. McMurtry*, 284 Ala. 283, 224 So.2d 638 (1969), or installed three successive engines in a span of ten months, *Volkswagen of America, Inc. v. Novak*, 418 So.2d 801 (Miss.1982). Rather, this is a case in which the seller was brought into court while in the process of making repairs—repairs, which by Mr. Tucker's own testimony, resulted in the proper functioning of the engines.

Having determined that there exists no genuine issue of fact and that defendant Chrysler is entitled to judgment as a matter of law, the court finds the motion for summary judgment on both the complaint and the cross-claim is well taken and is granted.