# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01888-SCT

*MERCURY MARINE, A DIVISION*
*OF BRUNSWICK CORPORATION*

*v.*

*CLEAR RIVER CONSTRUCTION CO., INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/14/2001 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DOUGLAS DREW MALONE |
| | RICHARD M. EDMONSON |
| ATTORNEY FOR APPELLEE: | DAVID W. MOCKBEE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 03/06/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## EN BANC.

### WALLER, JUSTICE, FOR THE COURT:

¶1.     This case concerns the applicability of express and implied warranties contemplated by Mississippi's version of Article 2 of the Uniform Commercial Code.  Clear River Construction Company was awarded a judgment of $30,000 on a jury verdict in the County Court of Rankin County, Mississippi, against Mercury Marine, a division of Brunswick Corporation, arising out of the sale of two outboard marine engines used by Clear River in competitive saltwater fishing.  The judgment, affirmed by the Rankin County Circuit Court, was based on Mercury Marine's breaches of express and implied warranties with respect to the engines.  Finding that Mercury Marine was not allowed a reasonable opportunity to cure,

that there was no failure of the repair or replace warranty's essential purpose, and that there were no breaches of the implied warranties of merchantability and fitness for a particular purpose, we reverse and render.

## FACTS AND PROCEDURAL HISTORY

¶2.    Nicholas Travis, president of Clear River Construction Company, is involved in the competitive saltwater fishing of king mackerel.  Realizing competitive saltwater fishing was expensive, Travis contacted Charles Henderson of Atlantic Marine Brokers in Waveland, Mississippi, in September of 1997 and proposed that Mercury Marine, a division of Brunswick Corporation, and World Cat Boats sponsor Travis in Division 7 of the Southern Kingfish Association.  Mercury Marine accepted and made Travis a member of its Saltwater Pro Team.  As one of approximately 1100 members in Mercury Marine's promotional programs, Travis would receive a substantial discount on Mercury Marine motors in exchange for Travis's promoting of its products by, for example, wearing Mercury Marine logo shirts and including the motors in promotional photographs.

¶3.    Travis purchased a new World Cat catamaran boat for $52,359.50 and two new 1998 200-horsepower Mercury Mariner Offshore motors for $13,862.00 (slightly above dealer cost) and a $300 freight charge to transport the motors to World Cat's facilities in Greenville, North Carolina, for installation. Travis wanted to purchase Mercury Marine's new Optimax motors but was informed that Mercury Marine was having problems with the development of the Optimax motors at the time.  The Mariner motors carried a typical repair or replace express warranty stating:

> Claim shall be made under this warranty by delivering the Product for inspection to a Mercury Marine dealer authorized to service the Purchaser's Product.  If Purchaser cannot deliver the Product to such authorized dealer, he may give notice in writing to the company.  We shall then arrange for the inspection and repair, provided such service is

2

covered under this warranty. Purchaser shall pay for all related transportation charges and/or travel time.

¶4. Travis took delivery of the boat and motors on November 18, 1997, and planned to travel to Wilmington, North Carolina, for the Southern Kingfish Association National Championship. A mechanic for Atlantic Marine Brokers traveled from Waveland to Greenville to assist in the installation and informed Travis when he took delivery that the motors had not been pre-run. Travis and the mechanic launched the boat in a nearby lake and realized that one of the motors would not run. Since the mechanic did not have the proper equipment to diagnose or repair the problem, Travis traveled to Crocker Marine, Mercury Marine's dealer in Wilmington. When Crocker Marine was unable to repair the motor, Travis traveled to another Mercury Marine dealer in Sneads Ferry, North Carolina, which was able to repair the problem, a defective throttle position indicator, as per the warranty. As a result, Travis was unable to "pre-fish," meaning scout for prime fishing areas prior to the tournament, and did not place.

¶5. The next problem with the motors occurred on August 7, 1998, during the GMC Gulf Coast Tournament at Dauphin Island, Alabama. In the meantime, nearly ten months had elapsed, and Travis had competed in four tournaments without any motor trouble. Specifically, the lower unit, or gear case, on the same motor which had malfunctioned earlier failed while Travis was fishing 83 miles offshore. After motoring back to shore on one motor, Travis had the lower unit replaced at Ed's Marine in Jackson at Mercury Marine's expense per the warranty. An inspection noted abnormal wear on the lower unit of the other motor which had yet to fail but was likewise replaced under the warranty. Travis had the two defective lower units rebuilt at his expense so that he could have them as spares. Mercury Marine usually kept the parts replaced under its warranties but allowed Travis to keep the old lower units and have them rebuilt.

3

¶6. Finally, on Friday, August 28, 1998, while pre-fishing in the Gulf of Mexico in preparation for the Cypress Cove Tournament, a rod bearing in the other motor failed thereby totally disabling it. Travis spoke with Joe Berkley, an employee of Dan Shad, head of Mercury Marine's promotional engine program, via cell phone from the Gulf requesting that they find a nearby mechanic or a spare motor. Travis likewise demanded that Mercury Marine air-freight a motor from its headquarters in Fond du Lac, Wisconsin, to Venice, Louisiana, for installation so that he could compete in the tournament. Berkley informed Travis that Mercury Marine would be unable to assist him as such and that he would have to take the motor to a Mercury Marine dealer for repair as required by the warranty.

¶7. Not being able to find a Mercury Marine dealer which would repair the motor that Friday night or the next morning, Travis traveled to a Yamaha dealership in New Orleans, Louisiana, which worked throughout the night installing a pair of new Yamaha outboard motors on Travis's World Cat boat. Travis spent over $21,000 on the Yamahas and returned to Venice to compete. The Mercury Marine motors had been operated approximately 132 hours and were subsequently repaired.

¶8. On October 26, 1998, Travis filed suit on behalf of Clear River seeking $34,980 for the costs of replacing the Mercury Marine motors with the Yamaha motors and loss of tournament prize winnings. The complaint alleged breach of express warranty and breaches of the implied warranties of merchantability and fitness for a particular purpose.

¶9. A Rankin County Court jury awarded Clear River $30,000. Judgment was entered in conformance with the verdict and added the stipulation that the Mercury Marine motors were to be returned to Mercury Marine. The Rankin County Circuit Court affirmed.

¶10. Mercury Marine alleges eleven assignments of error. However, our discussion focuses on the following four issues, the discussion of which renders all others moot:

I. **WHETHER MERCURY MARINE WAS GIVEN A REASONABLE OPPORTUNITY TO CURE.**

II. **WHETHER MERCURY MARINE'S "REPAIR OR REPLACE" WARRANTY FAILED OF ITS ESSENTIAL PURPOSE.**

III. **WHETHER MERCURY MARINE BREACHED THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

IV. **WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON INCIDENTAL AND CONSEQUENTIAL DAMAGES.**

## STANDARD OF REVIEW

¶11.    While we accord jury verdicts great deference, we will set aside such a verdict when a jury was improperly instructed, misled, confused, or ignores the weight of the evidence. *Jackson v. Daley*, 739 So. 2d 1031, 1039 (Miss. 1999) (citing *McKinzie v. Coon*, 656 So. 2d 134, 142 (Miss. 1995)).

## DISCUSSION

### I.    WHETHER MERCURY MARINE WAS GIVEN A REASONABLE OPPORTUNITY TO CURE.

¶12.    Mercury Marine first argues that Travis failed to afford it a reasonable opportunity to cure the motors' defects. By purchasing the Yamaha motors on the same day as the malfunction of the Mercury Marine motor and filing suit to recover the cost of the Yamaha motors, Mercury Marine contends that Travis failed to satisfy a legal prerequisite to recovery, namely, cure. Travis responds that the Mercury Marine motors failed on three different occasions and that Mercury Marine was given a reasonable opportunity to cure the defect each time, even the final time.

¶13.    In *Fitzner Pontiac-Buick-Cadillac v. Smith*, 523 So. 2d 324 (Miss. 1988), Smith purchased a used car and sued the dealer alleging breach of express and implied warranties when the car experienced problems with, among other things, an intake gasket, transmission, and radiator. Rather than bringing the car to Fitzner for repair, Smith unconditionally insisted that the contract for the car be deemed rejected and that he be given his money back. 523 So. 2d at 328. In reversing and rendering a jury verdict in favor of Smith for the purchase price of the car, we noted the following regarding a seller's right to cure:

> We recognize that a strict reading of the cure provisions of Miss. Code Ann. § 75-2-508 (1972) reveals no explicit application to the revocation situation with which we are here concerned. *The law's policy of minimization of economic waste strongly supports recognition of a reasonable opportunity to cure.* Though the express language of Section 75-2-508 does not apply here, cure is not

6

> excluded by Section 75-2-608. By analogy to Section 75-2-508 and in furtherance of the policy justification undergirding that statute and our common law doctrine of cure in contracts generally, we recognize that, before Smith was entitled to get his money back, Fitzner had a right to a reasonable opportunity to cure the vehicle's deficiencies.

523 So. 2d at 328 n.1 (citations omitted & emphasis added).

¶14. We agree with Mercury Marine that Travis should have brought the malfunctioning motor to a Mercury Marine dealer for repair according to the warranty. The two prior defects had been repaired under the warranty without question. Also, the third and final malfunction occurred on a motor that had yet to experience problems. The fact is that the same thing never broke twice over the ten months Travis used the motors, and there was never any indication that Mercury Marine would not repair the broken rod bearing. Mercury Marine should have been allowed to cure the defective motor. *See Tucker v. Aqua Yacht Harbor Corp.*, 749 F. Supp. 142 (N.D. Miss. 1990) (applying Mississippi law) (finding that in a case which was instituted while repairs were being made to piston defect on boat motor, manufacturer should have been allowed to cure and thus could not be held liable for breaches of express and implied warranties).

¶15. Also, this case is readily distinguishable from our prior opinions in which we found that the right to cure was not unlimited in the wake of repeated deficiencies and repeated attempts at repair. *Guerdon Indus., Inc. v. Gentry*, 531 So. 2d 1202 (Miss. 1988) (finding right to cure not unlimited in case where seller made ten attempts to repair a mobile home's defects in a five-month period); *Rester v. Morrow*, 491 So. 2d 204 (Miss. 1988) (holding likewise in a case where plaintiff's Renault automobile experienced problems with its electrical system, air conditioner, and oil indicator gauge justified buyer's revocation of acceptance).

## II. WHETHER MERCURY MARINE'S "REPAIR OR REPLACE" WARRANTY FAILED OF ITS ESSENTIAL PURPOSE.

¶16.    During the discussion on jury instructions, the trial court stated the following when it decided to

permit an instruction on failure of essential purpose:

> I am prepared to instruct the jury that the specific warranty here and limitations in the warranty failed of its essential purpose because under the facts of this case, the Mercury warranty did not do Mr. Travis or Clear River any good when he was out there in the middle of the ocean trying to engage in tournament fishing, and the engines went out or either didn't work to start with or went out in the middle of tournaments.

Reasoning that a motor malfunction in the ocean justifies an instruction on failure of essential purpose is

untenable.

¶17.    Under Miss. Code Ann. § 75-2-719(2), "Where circumstances cause an exclusive or limited

remedy to fail of its essential purpose, remedy may be had as provided in this Code." While Section 75-2-

719(2) clearly allows a plaintiff to seek redress under the Code, it fails to define a failure of essential

purpose, much less its application to a repair or replace warranty. That aside, academic commentary has

noted:

> The purpose of a repair-or-replace contracted remedy is to give the buyer what he bargained for, namely goods that measure up to the contract, and to expand the seller's right to cure beyond the bounds established by Section 2-508. This purpose is defeated if the goods are destroyed by their own flaws so that repair or replacement are totally unsatisfactory.

> * * *

> Conversely, where the prescribed remedy term appears to be intended to cover the loss that has occurred, there can be no failure of essential purpose, though the application of the term to the situation at hand may raise questions of unconscionability. In commercial transactions where the doctrine of unconscionability is avoided, a court might be

8

tempted in such a situation to limit the effect of the prescribed remedy on ground of failure of essential purpose or failure to provide a fair quantum of relief, but technically such a holding would be incorrect. In consumer cases, however, the doctrine of unconscionability is sometimes used as an alternative reason to avoid the enforcement of the contracted-for remedy.

2 William D. Hawkland, Uniform Commercial Code Series § 2-719:3, at 2-615 to -617 (1998).

¶18. The trial court's statement that the warranty did not do Travis any good "when he was out there in the middle of the ocean" hints at unconscionability. As a federal court in Washington noted in a case in which four $3 million tuna boats experienced problems with their reduction gear units and main propeller engines and carried repair or replace warranties:

> What was a "reasonable time" within the contemplation of the parties when they contracted for this remedy will depend upon their understanding of the likelihood and consequences of engine failure on a tuna boat. *Since the repair remedy by definition anticipates some failure, this alone could not frustrate the remedy's purpose.* Likewise, the mere occurrence of lost profits would not defeat the remedy because some such damages would be expected to flow from engine failure.

*Tacoma Boatbuilding Co. v. Delta Fishing Co.*, 28 U.C.C. Rep. Serv. 26, n.10 (W.D. Wash. 1980) (citations omitted & emphasis added). Merely because a boat's engine fails in the ocean, the very place it is supposed to operate, does not mean that the limited warranty of repair or replacement fails of its essential purpose.

¶19. The instant case also does not evidence repeated attempts by Mercury Marine to correct defects and the repeated failure to do so. We recognize that courts have consistently held that such repeated attempts amount to a failure of a warranty's essential purpose. *See AES Tech. Sys., Inc. v. Coherent Radiation*, 583 F.2d 933 (7th Cir. 1978); *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn. 1977); *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243 (Mo. Ct. App. 1978). We cannot say

9

that three separate incidents over a ten-month period amount to such a failure. Mercury Marine's limited warranty did not fail of its essential purpose.

### III. WHETHER MERCURY MARINE BREACHED THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

¶20.     Mississippi does not allow the disclaimer of the implied warranties of merchantability or fitness for a particular purpose. Miss. Code Ann. § 75-2-315.1. *See* ***Gast v. Rogers-Dingus Chevrolet***, 585 So. 2d 725, 728 (Miss. 1991). As a result, we agree with the trial court that these warranties could not be excluded, but we disagree that they were breached.

¶21.     Travis went to great lengths to show that he was not a normal customer because he was a member of Mercury Marine's Saltwater Pro Team, albeit one of 1100 members of Mercury Marine's promotional programs. He assumed that he was entitled to a higher level of service by virtue of such membership when all for which he contracted was a discounted price on the motors in exchange for various promotional services. There is nothing in the sponsorship program entitling him to special treatment outside of the repair or replace warranty or standard implied warranties.

¶22.     We find the fact that Mercury Marine was not afforded an opportunity to cure fatal to the jury's verdict. As discussed above in ***Fitzner***, the seller was entitled to an opportunity to repair the vehicle. We likewise noted:

> Smith later tried to get out of his deal with Fitzner. This occurred on August 20, 1984, when Smith delivered to Fitzner a letter "rejecting the contract" and telling Fitzner he "wanted . . . [his] money back." At this point Smith had no right of rejection. He had at most a right to revoke his acceptance. Miss. Code Ann. § 75-2-608 (1972). *In such circumstances, though there may have been a breach of the warranty of merchantability, the seller has a right to attempt cure.*

10

523 So. 2d at 327-28 (ellipsis and brackets in original) (emphasis added).

¶23. This reasoning was applied in *Tucker v. Aqua Yacht Harbor Corp.*, 749 F. Supp. 142 (N.D. Miss. 1990). In *Tucker*, the court held that a manufacturer of boat engines was entitled to cure ailments of oil leakage and low oil pressure caused by defective pistons. *Id.* at 147. On the issue of implied warranties, the court applied *Fitzner* and stated that "the seller must be afforded a reasonable opportunity to cure, even though there may have been a breach of an implied warranty." *Id.* at 145. That same prerequisite to recovery is also present under the Magnuson-Moss Warranty Act. *Id. See* 15 U.S.C. § 2310(e) (2002) (stating "No action . . . may be brought . . . unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply).

¶24. The dissent, in attempting to justify a jury verdict, would effectively render null the UCC's requirement of a *reasonable* opportunity to cure. Demanding warranty repair work on offshore outboard boat motors under a standard repair or replace warranty on a Friday night or Saturday morning cannot be considered reasonable under these or most any facts. Such a position would be not only improvident but also economically devastating, since sellers would be unwilling or unable to comply with such a truncated definition of "reasonable."

## IV. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON INCIDENTAL AND CONSEQUENTIAL DAMAGES.

¶25. Since we find that the express and implied warranties were not breached because Travis did not allow Mercury Marine to cure, it is axiomatic that the trial court erred in instructing the jury on incidental and consequential damages.

## CONCLUSION

11

¶26.     We find that Travis did not provide Mercury Marine a reasonable opportunity to cure the broken rod bearing.  There was also no failure of the repair or replace warranty's essential purpose or breaches of the implied warranties of merchantability or fitness for a particular purpose.  The evidence is insufficient to sustain the jury's verdict.  Therefore, the Rankin County Court judgment entered in accordance with a $30,000 jury verdict and the judgment of the Rankin County Circuit Court are reversed, and judgment is hereby rendered in favor of Mercury Marine, finally dismissing the complaint and this action with prejudice.

¶27.     **REVERSED AND RENDERED.**

**PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., CONCUR.  GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ AND EASLEY, JJ.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶28.     Because the majority fails to affirm the jury verdict, I dissent.  The facts of this case clearly indicate breaches of both express and implied warranties, and the seller's failure to cure within a reasonable time.  The jury below heard the facts and the evidence of this case, and was properly instructed on our Uniform Commercial Code. The jury decided in favor of Travis.  It was not only correct, but also imported the full weight of every single relevant fact into a sustainable common sense verdict.  Since the majority entirely deflates the facts and circumstances of this case in order to reverse this verdict,  I dissent.

¶29.     The majority's first deflation of fact and circumstance is having measured Travis's specific bargain with Mercury, the circumstances of that specific bargain, and the circumstances befalling Travis after that bargain, against an abstract reference to the transactions of 1100 other Pro Team members.  This case is not about any other  bargain made or sale transacted other than Travis's.

12

¶30.    The second deflation is the majority's framing of the bargain: In exchange for a discounted motor price, Travis was to promote Mercury products simply by wearing logo shirts and including the motors in promotional photographs. This construction of the bargain completely overlooks the potentialities of Travis ever having told the truth to the public about the motors he had purchased, that, not to mention their repeated failures throughout the tournament season, they were defective before they were ever installed on Travis's boat. Perhaps Travis should have smiled into the camera and said, "for a discounted price, you, too, can receive defective Mercury motors that increase your risk of failure in the very tournaments for which Mercury encouraged the purchase of your motors, and in which you nevertheless will be required to promote their reliability." The point is that the discounted price is irrelevant to whether the motors were defective. And even with repeatedly failing motors, Travis was still required to do much more to promote the reliability of those motors and other Mercury products than just wear a T-shirt with a Mercury logo.

¶31.    The majority's third deflation of fact regards the import of Mercury having refused to sell Travis the motors he really wanted. Travis wanted to buy Mercury's new "Optimax" motors, which were 45% more fuel efficient than predecessor Mercury motors, and which Mercury was advertising and selling to the general buying public. But Mercury *would not* agree to sell the Optimax motors to Travis *and* have Travis in the tournament promotion program specifically because the Optimax were not reliable. Mercury completely governed the choice of Travis's motors and selected "Mariner Offshore" motors as best for tournament competition and the promotional program.

¶32.    The fourth deflation of fact regards the events on the days prior to installation, but after the purchase. Mercury agreed, prior to installation, to pre-run the motors before *delivery* so that they would be "tournament ready." The motors were to be installed in Greenville, North Carolina, near the location of the Saltwater Kingfish Association National Championship in which Travis was to compete over the next

13

several days after installation. However, the motors were not pre-run before delivery; had they been, this entire case may have been avoided. Indeed, right out of the shipping crate, one motor was defective and would not run. Worse, it took an entire State's worth of Mercury mechanics to finally repair the problem. Mercury's almost complete inability to do so, however, has been perverted by the majority into satisfactory due performance under the warranty. Here is what the majority balks at: The mechanic in Greenville worked on the defective motor for an entire work day and could not repair the motor, all the while Travis was losing preparation time for the tournament. Mercury then told Travis to take the motor to Wilmington, where it had another mechanic at another dealership who would make another attempt to repair the motor. Travis drove to Wilmington with his boat and was at the dealer the next day when it opened. After working past lunch, however, the Mercury mechanic there could not repair the motor. Mercury then told Travis to take the boat and motor to Sneads Ferry, North Carolina, where yet another Mercury mechanic could attempt repair. After working another entire day, finally, the motor was repaired. Travis missed two days of pre-fishing for the tournament and incurred travel debts *due to repair attempts in three different cities* before the tournament. On these facts, and on this type of warranty service, it is remarkable that Travis went on to compete in three tournaments with the motors without any problems. These three problem-free tournaments, out of six altogether, were all Travis would get, however -- all the while required to promote Mercury's reliability during the six-tournament season about which Mercury was entirely aware?

¶33. The majority's fifth deflation of fact regards the impact of the consequences each time these motors failed. During the tournament at Dauphin Island, the lower unit went out on the *same* motor that was almost never repaired in North Carolina. As a result of this failure, Travis missed the weigh-in on the first

day of the tournament and missed the second day completely. Nonetheless, Travis was again able to compete despite the time consumed for motor repairs and required to promote the reliability of the motors.

¶34. That same month, the other motor completely failed while Travis was pre-fishing thirty miles off shore in the Louisiana tournament. Travis made *numerous* calls from his cellular phone to the Mercury manufacturing facility in Wisconsin and asked for help in locating the nearest dealer or mechanic, or to have Mercury find a motor anywhere in the region of the competition to which Travis could travel for installation or, as a last ditch alternative, to have Mercury overnight another motor to a local dealer from, not just Wisconsin as the majority indicates, but from any location including one nearby. Both Mercury and the majority have implied the alternative suggestion to overnight a motor borders on the ridiculous; although, in fact, "replacement" within a "reasonable" time is one of the remedies under the warranty; and, what is "reasonable" is question of fact dependent on the circumstances as a matter of law. The end result of this incident was Mercury's advice to Travis to take the motors to a dealer the following week after the tournament.

¶35. After having been clearly informed that Mercury would not repair or replace the broken Mercury motor on either Friday afternoon, nor Saturday morning, nor Saturday afternoon, nor would it send a replacement motor, nor would it locate a Mercury dealer or mechanic who may have been able to assist him during the 48 hours before the tournament, a Yamaha dealer came to Travis's aid.

I.

*Mercury's express warranty failed of its essential purpose.*

15

¶36. Mercury expressly warranted that Travis's new motors would be "free from defects in material and workmanship" and also provided a limited "replace and repair" remedy to Travis in the event of a defect. The warranty was effective through February of 1999. It reads:

> Our obligation under this warranty shall be limited to repairing a defective part, or at our option, refunding the purchase price or replacing such part or parts as shall be necessary to remedy any malfunction resulting from defects in material or workmanship as covered by this warranty.

Additionally, Mercury advised in its warranty package that:

> Claim shall be made under this warranty by delivering the Product for inspection to a Mercury Marine dealer authorized to service the Purchaser's Product. If purchaser cannot deliver the Product to such authorized dealer, he may give notice in writing to the company. We shall then arrange for the inspection and repair, provided such service is covered under this warranty. Purchaser shall pay for all related transportation charges and/or travel time.

¶37. The essential purpose of a "repair and replacement" warranty such as this is to "provide confidence and assurance to the buyer that he will secure goods conforming to the contract, and to provide a limitation of liability to the seller."[1] *Royal Lincoln-Mercury Sales, Inc. v. Wallace,* 415 So.2d 1024, 1028 (Miss.1982). Under Section 75-2-719(2), such a warranty fails of its essential purpose if the seller is unwilling or unable to repair or replace the product or if there is unreasonable delay in repair or replacement

---

[1] See Roy Ryden Anderson. *Failure of Essential Purpose and Essential Failure on Purpose: A Look At Section 2-719 Of The Uniform Commercial Code.* 31 SW L.J. 759 (1977). As Professor Anderson illustrates by citing *Beal v. General Motors Corp.,* 354 F. Supp. 423, 12 UCC Rep. Serv. 105 (D. Del. 1973):

> The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty. . .The limited, exclusive remedy fails of its essential purpose. *Id.*

16

of product. *See, e.g.,* **Riley v. Ford Motor Co.,** 442 F.2d 670 (5ᵗʰ Cir. 1971). Indeed, if the seller does not or cannot correct the defect within a reasonable amount of time, the buyer is deprived of the substantial value of his bargain. *See, e.g.,* **Mercedes-Benz of North America, Inc. v. Dickenson,** 720 S.W.2d 844 (Tex. App.1986); *see*, *e.g.* **Riley v. Ford Motor Co.,** 442 F.2d at 673 (jury was justified in finding that the warranty deprived the buyer of the substantial value of the bargain where buyer returned the defective car once and warrantor was unable to correct the defects). This bargain deprivation is the thrust of the essential purpose doctrine of Section 75-2-719 of the UCC.[2] In yet other cases, repair may not be acceptable because the consumer may have an immediate need for the goods. In such cases, the limited remedy would seem to fail its essential purpose. The analysis here follows accordingly.

¶38.     In the present case, Mercury provided its "repair or replace" remedy as Travis's only remedy in the event of a motor defect. As such, it must have provided Travis with the benefit of his bargain under the circumstances. The circumstances of this case are therefore determinative of whether the warranty failed of its essential purpose.

¶39.     Although Travis maintained Pro Team status with Mercury, Mercury contends that this status did not provide Travis with more than Mercury's "standard" consumer warranty protection or remedies. Mercury so informed Travis in both the warranty package and Mercury's "Promotional Motor Program." In other words, Mercury contends that Travis's expectations under the circumstances could be no different than that of any other buyer. The jury obviously found Mercury's argument without merit.

---

    [2]    If such a warranty fails to provide an adequate remedy to the buyer, then its function as a limitation of liability also fails, thus allowing the buyer to seek all available remedies in order to be made whole.

17

¶40.    The facts of this case, as well as the jury verdict, indicate that Mercury knew Travis was no average consumer; nor was the transaction between them ordinary. Indeed, communications leading up to the transaction make this clear.

¶41.    First, as the record indicates, "[t]his is a case where as an integral part of the sale of the motors, Travis committed to fish for and promote Mercury as set forth in the Promotional Agreement," which was agreed upon as follows:

> As a condition of being considered for the Mercury Marine promotional program, I agree to provide the following support to Mercury Marine and/or my dealer.
>
> I agree to wear promotional clothing provided to me by Mercury Marine at any public speaking event such as but not limited to, tournaments, boat shows, seminars and other programs.
>
> Every effort will be made to include the outboard in any press photo opportunity.
>
> I will make no changes in the appearance of the outboard without consent of Mercury Marine.
>
> I will provide copies annually of articles, photographs, or news clippings which identify me as a Saltwater Pro Team member to Mercury Marine for future team membership evaluation.
>
> I agree to provide, upon request, a minimum of two days of promotional activity or guiding, as appropriate at no charge. This activity may be requested by Mercury Marine and/or my dealer.
>
> I will provide the right to use my name, voice, biographical material, photography or other likeness to promote Mercury Marine products.

¶42.    This piece of evidence alone is sufficient to lead a trier of fact to conclude that Mercury provided the motors to Travis for use in time-sensitive, competition fishing, during which Travis was required to promote Mercury Marine.

18

¶43.    Second, the selected motors at issue were to be promotional proof of their reliability. In fact, Mercury specifically selected them for Travis over other motors because they were tried and tested. Mercury also promised to pre-run them before they were shipped to ensure they were "tournament ready" when they were installed on Travis's boat. They were not ready, however. Mechanical problems arose immediately; and Travis spent the better part of two days at the outset traveling throughout North Carolina to have the motors repaired and installed. Additionally, Travis was denied any repair or replacement during the Cypress Cove tournament.

¶44.    Indeed, not only were these motors continuously in need of repair during the competition season, in the final case of motor failure, while thirty miles out at sea, Travis contacted Mercury for assistance, and Mercury did nothing, except advise Travis to find a dealer the following week – **after the tournament**. Given the nature of the bargain between the parties, however, the jury obviously reasoned that Mercury's warranty was inadequate because it left Travis without any remedy under the sensitive circumstances of tournament fishing for which Mercury knew the motors were purchased. This warranty, indeed, left Travis out to sea.

¶45.    Accordingly, upon proper instruction from the court, the jury concluded that Mercury's limited warranty failed of its essential purpose. During legal arguments below as to the jury instruction, the judge stated to counsel, as the majority points out:

> I am prepared to instruct the jury that the specific warranty here and limitations in the warranty failed of its essential purpose because under the facts of this case, the Mercury warranty did not do Mr. Travis or Clear River any good when he was out there in the middle of the ocean trying to engage in tournament fishing, and the engines went out or either didn't work to start with or went out in the middle of tournaments.

The majority responds to this statement by stating that "[r]easoning that a motor malfunction in the ocean justifies an instruction on failure of essential purpose is untenable." Such a response itself may be tenable

if the justification which the majority invents were accurate. The judge's statement indicates that such an instruction would be based on multiple "facts" indicating the warranty was no good when both of the "engines" either "went out" or "didn't work to start with" or "went out in the middle of tournaments." In fact, the judge recognized, as the majority fails to do, that there was more than one malfunction, whether in the middle of the ocean or otherwise.

¶46.    Accordingly, the judge instructed the jury as follows:

> The court instructs the jury that the limited warranty contained in the written warranty given to Clear River by Mercury Marine is the exclusive remedy available to Clear River unless you find by a preponderance of the evidence that the limited warranty operates to deprive either party of the substantial value of the bargain. The Limited warranty fails of its essential purpose if Mercury Marine was unwilling to repair or replace the defective powerhead or if the engine was unrepairable or if Mercury Marine unreasonably delayed in repairing or replacing the powerhead.

¶47.    The majority goes on, however, to ignore the bargain deprivation analysis upon which the essential purpose doctrine is based, to hinge the failure of the warranty upon the one instance of motor failure in Louisiana. Citing *Tacoma Boatbuilding Co. v. Delta Fishing Co.,* 28 U.C.C. Rep. 26 (W.D. Wash. 1980), the majority holds that "[m]erely because a boat's engine fails in the ocean, the very place it is supposed to operate, does not mean that the limited warranty of repair or replacement fails of its essential purpose." Credit is to be given to the majority for its keen insight on this point. But this is not the reason the present warranty failed, or why any warranty would fail. The warranty failed because it deprived Travis of the benefit of his bargain given the circumstances pursuant to which that bargain was made.

¶48.    The majority also concludes that there is no "evidence of repeated attempts by Mercury Marine to correct defects and the repeated failure to do so." Without defining specifically what "repeated" means,

20

there were five individual attempts to repair in this case, only three of which were successful, and one of which came after the agreement between these parties became the subject of this lawsuit.

¶49.    The jury was fully informed of the circumstances of the bargain made in this case, the repeated failures of the motors, the repair attempts, both successful and not, and the usefulness of the warranty in general and in the final instance of motor failure.  It found that Mercury's limited warranty was inadequate and/or Mercury failed to reasonably act upon it, and therefore decided according its instructions on the law, that the warranty failed of its essential purpose because it deprived Travis of the benefit of his bargain.[3] The jury verdict coincides with reality on this issue.  The majority opinion does not.

## II.

*Implied warranties of merchantability and fitness for a particular purpose.*

¶50.    The majority states that these warranties cannot be disclaimed; therefore it agrees that these warranties exist in the present case.  Implied warranties of merchantability and fitness for a particular purpose do not exist *because they have not been disclaimed*.  They exist if the facts of sale and of the circumstances leading up to the sale imply their existence.

¶51.    In the present case, upon sale of the motors, Mercury warranted by implication that they were suitable for at least ordinary use or were, rather, "merchantable." [4] Section 75-2-314 of the Mississippi

---

[3] Additionally, there are numerous cases standing for the proposition that a limited remedy fails after the seller has been given a reasonable number of opportunities to repair, replace or otherwise cure.  Indeed, cured defects do not disappear. They  are to be considered cumulatively in determining whether a remedy has failed or whether instead they buyer must allow the seller yet another opportunity.  Given the nature of this bargain and the repeated defects, the jury was amply justified in concluding that a third failure within such a short period of time, taken with the first two, caused the remedy to fail as well.

[4] Merchantable goods are those that (1) pass without objection in the trade under the contract description, (2) are of fair average quality, (3) are fit for the ordinary purpose for which such goods are used, (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved, (5) are adequately contained, packaged and labeled, and (6) conform to the promises or affirmations made on the label. Miss. Code Ann. § 75-2-314(2) (2000).

21

UCC states that " a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Miss. Code Ann. § 75-2-314 (2000). There is no question as to Mercury's merchant status, or as to whether the motors Mercury sold to Travis were classified as goods sold from Mercury's regular inventory. Therefore, an implied warranty of merchantability under our UCC applies to the motors. Given their repeated failures, the jury obviously found them defective, or rather, not merchantable, which it reasonably could do. Indeed, the motors failed in not one, not two, but in three out of six competitions over one tournament season.

¶52. In addition to the implied warranty of merchantability, our UCC implies a warranty of fitness for a particular purpose where (1) the seller at the time of contracting has reason to know any particular purpose for which the goods are required and (2) the buyer is relying on the seller's skill or judgment to select or furnish suitable goods for that particular purpose. Miss. Code Ann. § 75-2-315 (2000).

¶53. Given the circumstances leading up to the purchase of the motors, this warranty is entirely applicable. During trial, however, Mercury contended that its bargain with Travis was limited to ensuring that his boat simply "propelled through water." But as has already been addressed, the record is abundant with evidence that Mercury *knew* that Travis purchased the motors for use in time-sensitive fishing tournaments. Moreover, Mercury selected the motors for Travis as the best for his intended purpose -- for the promotional program and for competitive fishing. Mercury's attempt to contradict this reality is really incredible. As the trial judge reasoned:

> I am persuaded that this is a case clearly where Mercury had a greater obligation than just
> selling a boat motor to somebody, and that's based on the proof that's already in the
> record that this was an undertaking -- even if there wasn't some kind of sponsorship
> contract, and nobody is alleging there is. All of that paperwork clearly establishes that

before these motors were ever put on Mr. Travis's boat, Mercury knew exactly what he was going to be engaged in – competitive fishing, king fishing specifically.[5]

¶54.    It is hard to disagree with this reasoning. It is apparent from Travis's first contact with Mercury that the motors were to be used in his endeavors as a competitive saltwater fisherman. In exchange for a discounted price on the motors that Mercury, not Travis, selected, Mercury required Travis's promotional support in several ways during the tournament fishing season, including in the press, on the water, and in the public in general. ¶55.    There is absolutely no way, therefore, Mercury can get around the fact that (1) it knew that Travis required the motors for the purpose of tournament saltwater fishing, and (2) that Travis relied on Mercury's judgement in selecting the best motors for this purpose. Therefore, Mercury implied that the motors it selected and sold to Travis were fit for the particular purpose of competitive tournament fishing under time-sensitive conditions. Due to constant defects, however, these motors were not fit for that purpose.

¶56.    The jury was appropriately instructed on this warranty and returned a verdict in favor of Travis. Indeed, there is ample evidence in the trial record to support a finding that the seller, Mercury, both made and breached an implied warranty of fitness for a particular purpose by providing Travis with clearly defective motors.

III.

*"Reasonable" opportunity to cure.*

---

[5]The referenced paperwork includes the pro team application form, the promotional agreement, the saltwater team promotional motor program that specifically references tournament success and commitment, the monogramming bill, and the correspondence between Travis, Mercury, and World-Cat Boats, including the promotion request form and the Pro team acceptance letter.

¶57.    The Mississippi UCC provides that sellers shall have a reasonable opportunity to cure defects in their products. *Fitzner Pontiac-Buick-Cadillac, Inc. v. Smith*, 523 So.2d 324, 325 (Miss. 1988). The period of time which constitutes a "reasonable" opportunity, however, is nowhere defined as a matter of law, because it is an issue of fact. "The phrase 'reasonable opportunity to cure' is necessarily a flexible one, and its meaning is dependent on the facts and circumstances of each case." *Tucker v. Aqua Yacht Harbor Corp.*, 749 F. Supp 142, 147, 144-46. (N.D. Miss. 1990). Indeed "[w]hat is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." *Id*. It is clear, therefore, that whether a seller is given a reasonable opportunity to cure is a fact question properly left for the jury's determination under correct instructions. *Royal Lincoln-Mercury Sales,* 415 So.2d at 1027; *see also Tucker,* 749 F. Supp. at 144-46.  In the present case, the jury below was instructed as follows:

> Before there can be a recovery for a breach of warranty, the plaintiff must show by the preponderance of the evidence (1) that the goods were nonconforming, (2) that the seller was given a reasonable opportunity to cure the defects, and (3) that the seller  failed to cure the defects within a reasonable time or within a reasonable number of attempts.

¶58.    The evidence in this case established three instances of motor failure, and five repair attempts. The jury could have reasonably concluded therefore, as it did,  that these motors were materially defective, or rather, in UCC parlance, nonconforming.  The jury also could have reasonably found, as it did,  that while in the first two instances of motor failure, Mercury lived up to its provided remedy, although not without a great deal of challenge, it did not do so in the final instance even though it was given a reasonably opportunity to do so.  Additionally, although Mercury repaired the motors the first two times, it could have also replaced them or refunded Travis's money, which it did not do.

¶59.    Specifically, in the final instance of motor failure, 48 hours were remaining before the final tournament when Travis notified Mercury that one of the motors had completely failed.  During that 48 hour

24

period, Mercury did nothing. The question before this Court, therefore, which was also before the jury, was whether Mercury had a reasonable opportunity under the circumstances of this case to effect the remedy it guaranteed to Travis – to replace or repair the motors, or, at its option, to refund the price Travis paid for them -- in other words, to cure.

¶60. As this Court held in ***Massey-Ferguson, Inc. v. Evans***, 406 So.2d 15, 17 (Miss 1981), at the very least:

> A warranty by a seller that goods will be repaired or replaced if found to be in defective condition implicitly provides that the seller has the capability of making such repairs or replacement within a reasonable time. *This capability means that the seller has reasonably available personnel qualified to make the repairs and that any parts necessary for such repairs are readily available.*

***Id***. (emphasis added).

¶61. Travis testified that he was willing to take his boat to a Mercury dealer for motor repair and alternatively requested that Mercury ship a new motor. Travis also testified that Mercury did not even return his phone calls while he was thirty miles off shore. Mercury did not contradict this testimony. And nowhere does the record indicate that Mercury was barred by an impossibility to help Travis. Rather, the evidence indicated that Mercury was not in any way available, ironically while sponsoring competitive fishermen, such as Travis, across the country during time-sensitive weekend tournaments. Mercury simply said there was nothing it could do, would do, or would even attempt to do until the following week – after the tournament. This type of performance does not match the bargain made between these parties. And again, the majority entirely misses this legal point. It does not even in one single sentence address the circumstances of the bargain made here – upon which Mercury's cure right depends – to justify reversing the judge and jury in this case.

¶62. The entire agreement centered around Travis's tournament successes. And in fact, the evidence that preceded the sale of the motors overwhelmingly speaks to the importance of the tournaments to Travis. Ultimately the bargain was this: Travis would succeed, as he had in the past, and Mercury Marine would benefit from it. To Travis, the bargain he made with Mercury meant reduced costs through sponsorship, more wins, more money, and reputable, reliable motors. To Mercury, the bargain meant more exposure and thus the sale of its products. Mercury was fully aware of the nature of this bargain, as is indicated in the various promotional materials it provided to Travis prior to shipping the motors.

¶63. Mercury's right to cure therefore turns entirely on the reasonableness of Travis's decision *not* to withdraw from the final tournament instead of waiting around for Mercury to effect repair, replacement, or a refund -- in other words, to cure.

¶64. Withdrawing from the final tournament and waiting for Mercury to assist would have been, without question, unreasonable for Travis, a competitor of consistent top-ten standings in his tournament division, who had been out there in the field living up to his end of the bargain with Mercury -- promoting its name and products. Indeed, the evidence in this case shows exactly how much Travis had to lose, and that Mercury was fully aware of the magnitude of those potential losses. The final tournament was Travis's last chance to regain first place or at least a top ten position as he had promised to his sponsors, including Mercury Marine. Moreover, this was Travis's last chance to qualify – as he had the previous year – for the SKA National Championship and the Kingmaster 100, with top prizes of over $50,000. In fact, Travis's success in his division the previous year inspired him to seek Mercury's promotional support in the first place. It also earned him the distinguished invitation to the National Championship in North Carolina where the first of Mercury's motor defects occurred in this case. These facts are clearly pertinent

26

to whether Travis's decision not to sit out of the final tournament, and thus afford Mercury an opportunity to cure the next week, was reasonable.

¶65.    This evidence and issue were properly submitted to the jury and resolved in Travis's favor. Implicit in the jury's verdict is that Mercury was indeed given a reasonable opportunity to cure under the circumstances, but failed to do so.  The jury's verdict should not be disturbed.

¶66.    Notwithstanding affirmation of the jury on this basis, the  doctrine of "shaken faith," or of "loss of confidence," is also applicable here, which  limits  a seller's broader right to cure.[6] *See, e.g., **Rester v. Morrow**, 491 So.2d 204 (Miss. 1986) (* a seller's right to cure is not unlimited; the time may come when "enough is enough.").  This Court has consistently held that a "seller's right to cure is not unlimited. . . There comes a time 'when enough is enough' and a purchaser is entitled to seek revocation 'notwithstanding the seller's repeated good faith efforts ...'" **Guerdon Indust., Inc. v. Gentry,** 531 So.2d 1202, 1208 (Miss.1988) (citing **Rester v. Morrow***, 491 So.2d 204, 210 (Miss.1986)).

¶67.     Our leading shaken faith case is**Rester** in which the buyer repeatedly brought his automobile back to the seller for repairs. "Equally as repeatedly, the repair efforts failed." ***Id***.  We held that the seller's right to attempt cure was not without limit, that there comes a point where the buyer is not required to continue returning the car to the seller and experiencing the attendant inconveniences of having his car out of operation.  "Our law does not allow a seller to postpone revocation in perpetuity by fixing everything that goes wrong with the automobile. There comes a time when enough is enough--when an automobile purchaser, after having to take his car into the shop for repairs an inordinate number of times and

---

[6] Although we have not had an occasion to adopt the phrase  "shaken faith," it has been adopted by a number of our sister courts in cases where the issue is one of reasonableness in providing a seller an opportunity to exercise its right to cure.

27

experiencing all of the attendant inconvenience, is entitled to say: "That's all. . ." notwithstanding the seller's repeated good faith efforts to fix the car." *Id*.

¶68.    Indeed, where a buyer's confidence in the dependability of a machine is shaken because of the defects and possibly because of a seller's ineffective attempt(s) to cure, revocation can be justified. *Id. See also Hemmert Agr. Aviation, Inc. v. Mid-Continent*, 663 F. Supp. 1546 (D. Kan. 1987); *Lathrop v. Tyrrell,* 128 Ill.App.3d 1067, 84 Ill.Dec. 283, 471 N.E.2d 1049, 39 UCC Rep. 1653 (1984); *Haverlah v. Memphis Aviation, Inc*., 674 S.W.2d 297, 40 U.C.C.Rep. 1263 (Tenn.Ct.App.1984); *Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J.Super. 441, 240 A.2d 195 (N.J.Sup.Ct.1968)(attempted cure held ineffective; "Once [the buyers] faith is shaken, the vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is substantially impaired and whose operation is fraught with apprehension."); *Orange Motors of Coral Gables v. Dade County Dairies,* 258 So.2d 319 (Fla.App.1972) ("The buyer of an automobile is not bound to permit the seller to tinker with the article, indefinitely in the hope it may ultimately be made to comply with the warranty... [citations omitted] At some point in time, if major problems continue to plague the automobile, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect.")

¶69.    The evidence at trial indicated that Travis's confidence in both these motors *and* in Mercury's ability to provide adequate warranty service was lost.  One of the motors was defective at the outset, and continued to manifest subsequent defects.  And one cannot minimize the fact that the dealer could not even completely install and repair one of the motors due to its defective condition, which caused Travis to spend two days searching for a Mercury mechanic in the Eastern half of North Carolina who had the acumen to

do so. Moreover, the motors failed in two consecutive tournaments, each of which literally, and figuratively, left Travis out to sea. When the motor failed during the pre-fishing day of the final tournament, Travis was under no further obligation, under the doctrine of shaken faith, to allow Mercury an opportunity to cure or repair. Even if, once again, Mercury had offered to repair, Travis justifiably would have had no confidence in the future performance of these motors. Travis was therefore entitled to declare, in the parlance of our "shaken faith" jurisprudence: *"That's all."* A jury of Travis's peers, applying the correct legal standards, affirmed his having done so.

IV.

*Compensatory, consequential and incidental damages were proper.*

¶70.    Mercury argues on appeal that the jury should not have been instructed on these damages. And the majority has held that since there were no breaches in this case, it need not address the issue. Since the majority's factual and legal reasoning is deficient throughout this appeal, however, damages are addressed here.

¶71.    Mercury's counsel did not specifically object to omissions or defects in the jury instructions. Rather, he simply stated: "We don't think this is a proper case for compensatory, incidental, or consequential damages, and so, therefore, we object to any instruction given to the jury on those issues." So the present question is whether this *is* a proper case for such damages.

¶72.    Foremostly, while Section 75-2-719 of the Mississippi UCC generally allows for remedy limitations, sub-section (4) thereof provides that [a]ny limitation of remedies which would deprive the buyer of a remedy to which he may be entitled for breach of an implied warranty of merchantability or fitness for a particular purpose *shall be prohibited*." Miss. Code Ann. § 75-2-719(4) (2000) (Emphasis added). Since these warranties and breaches thereof exist in the present case, despite the majority's conclusion,

Travis's was allowed to pursue remedies beyond the limited remedy provided him under Mercury's express warranty.

¶73.    Specifically, Travis sought $34, 980. in damages as costs associated with the defective motors. The breakdown of this amount is as follows:

> Replacement motors, labor to install: 21,370.
> North Carolina repair and travel:      $ 4,904
> Dauphin Island Tournament repair: $ 3,706.
> Lost prize money (estimate): $ 5,000.[7]

¶74.    The jury awarded Travis $30,000, which covers only the actual damages, not the prize money -- as this was speculative. Indeed, the point of an award of damages for breach of a warranty is to put the injured party where he would have been had there been no such breach. To cite the Fifth Circuit, "[t]his general principle serves as the focal point of the appropriate measure of damages as we work our way through the applicable provisions of the Mississippi UCC." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 370 (5th Cir. 2002).

¶75.    Mercury argues that this is not a proper case for "cover" damages. Mercury is correct. Indeed, cover damages are not available to a party who has accepted goods. Miss. Code. Ann. § 75-2-11 (2000). Since Travis had already accepted the motors, he is not entitled to any a cover remedy. Therefore, and since revocation of acceptance was *no*t plead in this matter, Travis's damages are governed entirely by Section 75-2-714:

**§ 75-2-714. Buyer's Damages for Breach in Regard to Accepted Goods**.

---

[7] Travis cannot prove that had the motors been functioning properly, he would have placed in the tournaments. As such, damages for Travis's speculated loss of prize money are not at issue for the purpose of establishing damages. The verdict reflects this reasoning, in that the jury did not award Travis all that he sought, which included a $5000. loss in prize money, minus his own personal expenses in attempting to win this prize.

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) [§§ 75-2-607] he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under section 75-2-715 may also be recovered.

¶76.    Miss. Code Ann. § 75-2-714 (2000). This section provides that "damages for any non-conformity of tender" may be "determined in any manner which is reasonable." *Id*. The Comment to this Section instructs that "[t]he 'non-conformity' referred to in subsection (1) includes not only breaches of warranties but *also* any failure of the seller to perform according to his obligations under the contract. Miss. Code. Ann. § 75-2-714 cmt. 1 (2000).[8] Further, while "the basic damage measurement is provided by subsection (2) as "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been warranted," a buyer is "entitled to measure his damages differently if 'special circumstances' show proximate damages of a different amount." Roy R. Anderson, Damages Under the Uniform Commercial Code. § 7:05. (3rd ed.) (Supp. 2000). This Section also provides that "[i]n a proper case any incidental and consequential damages under Section 75-2-715 may be

---

[8] As the Comment indicates, "[t]his section deals with the remedies available to the buyer after the goods have been accepted.  Further, "[t]he 'non-conformity' referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract. In the case of such non-conformity, the buyer is permitted to recover for his loss 'in any manner which is reasonable.'
    Subsection (2) describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty but it is not intended as the exclusive measure of damages.  Indeed, it provides for a difference in value formula, *"unless special circumstances show proximate damage of a different amount."*

recovered." Miss. Code Ann. § 75-2-714 (3); *see also* **Beck Enterprises, Inc. v. Hester**, 512 So.2d 672 (Miss. 1987). Such damages are defined in Sections 75-2-715(1) and)75-2- 715(2):

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

> (2) Consequential damages resulting from the seller's breach include
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. . .

¶77.     The value differential formula of Section75-2-714(2) is not applicable in the present case since the cost of the replacement Yamaha motors can in no way reflect the value of the Mercury motors at the time they were accepted.  However, the award for the cost of replacement motors in this case was justified under the "special circumstances" exception of Section 75-2-714 (2) as well as the provision allowing damages to be measured in "any manner that is reasonable" in Section 75-2-714(1).

¶78.     **City of New York v. Pullman,** 662 F.2d 910 (2nd Cir. 1981), is most instructive for the present damages analysis.  The City of New York and the New York City Transit Authority sought to recover from Pullman, Inc. and Rockwell International Corporation (Rockwell) for breach of warranty arising from Pullman's sale of 754 subway cars to the City. *Id*. at 912.  Rockwell designed unique undercarriages, which were to withstand an average stress when the cars were in service. *Id*. at 913.  But once the cars were in use, the transform arms on the undercarriages were subject to far more stress than they could withstand on a regular basis. *Id*.  They vibrated excessively which led to inordinate cracking. *Id*.  The undercarriages of the subway cars consistently failed and had to be replaced. *Id*.  Rockwell then

designed a system for repairing the undercarriages, referred to as a "retrofit." *Id*. However, experts concluded that the retrofit would add stresses on untested parts of the cars that were not designed to take heavy loads. *Id*. Ultimately the City and Transit authority had to replace the Rockwell undercarriages with standard undercarriages, and sought the cost of replacement under the "special circumstances" provision of the UCC.

¶79. The Second Circuit upheld the replacement cost, reasoning that, "[w]here special circumstances justify the use of a measure of damages other than that expressly provided by statute 'plaintiff may recover for its direct damages in any manner that is reasonable." *Id*. at 918   *(*citing ***Am. Power Co. v. Westinghouse Elec. Corp***, 418 F. Supp. 435, 454 n.34 (S.D.N.Y. 1976) Official Comments 2 and 3 to N.Y. U.C.C. § 2-714 (McKinney 1964).  The Court held that:

> An appropriate measure of damages under that provision is the "actual cost" of a remedy that meets the ultimate requirements of the contract by converting non-conforming goods into goods which will perform as warranted – even if that remedy required replacing defective parts with parts substantially different than those provided under the contract, at a time later than delivery – as long as that remedy meets the ultimate requirements of the contract 'at the lowest cost and with the least delay." ***District Concrete Co. v. Bernstein Concrete D.C.***  418 A.2d 1030, 1036, (D.C.App.1980); *see* ***Curtis v. Murphy Elevator Company***, 407 F.Supp. 940, 948 (E.D. Tenn.1976).
>
> 662 F.2d at 918.

¶80. In the present case, Travis's purchase of the Yamaha motors is justified under the same reasoning. The special circumstances are those surrounding the bargain made with Mercury, which were articulated to the jury, in Travis's words,  by counsel below:

> This is not just a customer/manufacturer warranty case. This is a Mercury Saltwater pro-team fisherman request to make me whole because you didn't provide the motors that you selected for me that you promised me would perform, not just in any situation, but in competitive team fish competition that you knew Clear River would engage in over the

course of the next twelve months and have only limited opportunities to successfully engage in that endeavor for the benefit, not just of [Travis] but for the benefit of Mercury.

¶81.    Nevertheless, in the final instance of motor failure Travis had to repair or replace the motor at his own expense, in addition to expenses incurred traveling up and down the Eastern half of North Carolina's looking, and hoping, for a Mercury mechanic with the ability and tools to effect repair in the first instance. He tried to work with Mercury in locating a mechanic, or a dealer, or another motor, all to no avail. Travis only had two choices remaining: go to another dealer or do not compete. Additionally, to work properly, both motors had to be of the same brand. Travis was therefore required to buy two Yamaha motors even though only one Mercury motor failed. Because of the unique situation presented here, especially those regarding Mercury's awareness of the time-sensitivity involved, Travis is entitled to the purchase price of the replacement motors under the "special circumstances" provision of our UCC.

¶82.    Additionally, Travis is entitled to both incidental and consequential damages under Section 75-2-714 (3). This Court has held that a proper case for incidental and consequential damages is one in which a seller fails to effect its warranty. ***Massey-Ferguson Inc., v. Evans,*** 406 So.2d 15 (Miss. 1981).[9] Generally, if an express limited warranty provides the exclusive remedy, and that warranty fails of its essential purpose, the purchaser can then pursue the other remedies provided by the Code including consequential or incidental damages. *Id.* Specifically, a buyer is entitled to recover expenses resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to

---

[9] In ***Massey-Ferguson***, the seller argued that damages with respect to a new grain drill were limited by the written warranty to either repair or replacement of any defects, at the option of the seller. We held, however, that as in ***Ford Motor Co. v. Fairley***, 398 So.2d 216 (Miss. 1981), "such limitation of damages as allowed under Section 75-2-719 presupposes that the warrantor has fulfilled his warranty." In that case, as in the present, the seller failed to either repair or replace the defective equipment and, therefore breached its warranty. We held then, as should be presently held, that "under these circumstances, the buyer's remedies are governed by section 75-2-714 and section 75-2-715(2)(a) which allow for recovery of consequential and incidental damages resulting from such a breach.

34

know and which could not reasonably be prevented by cover or otherwise. *Massey-Ferguson* 406 So.2d 15 (Miss. 1981).

¶83.    In *Massey-Ferguson*, we held (1) that such damages must be reasonably ascertainable and (2) the plaintiff cannot recover from losses he reasonably could have prevented. *Id*. Quoting J. Wright and S. Summers, *Handbook of the Law Under the Uniform Commercial Code* (2nd ed. 1980), we reiterated that Section 75- 2-715(2) codifies the more liberal reading of *Hadley v. Baxendale* and further quoted that "[m]ost of the courts have recognized that a seller is liable for all damages resulting from his breach if they arise from circumstances that the seller knew about or had reason to know about, even if he did not consciously assume the risk of such liability." 406 So.2d at 19. And finally, "[t]he consequential damages provisions provide the only Code remedy that can come close to fully compensating" a plaintiff for damages suffered due to a seller's breach. *Id*. at 20.

¶84.    The evidence showed that, as a result of repeated motor failure, Travis incurred consequential and incidental damages. He is entitled to recovery for these damages under the discussed UCC provisions and as guided by our case law. Indeed, Mercury could easily foresee at the time of contracting that undesirable consequences would follow if Travis could not compete due to motor failure. And the evidence at trial did not indicate that Travis engaged in avoidable, exorbitant spending to deal with such consequences when they did arise. The jury was instructed accordingly. And for these reasons, it properly awarded Travis consequential and incidental damages resulting from Mercury's breach of its warranties.

¶85.    One final consideration on this topic is Mercury's objection to Instruction Six, regarding the relative bargaining power of the parties and thus to the limited warranty, and, thus to incidental and consequential

damages.  Mercury argued there was  nothing in evidence on the relative bargaining power of the parties, and that the limited warranty prohibition was therefore inapplicable.   The trial judge disagreed:

> This case is a little different because of Mr. Travis's company's saltwater fishing team relationship with Mercury; and while I would agree with you [that] if this were a general case of the failure of a motor by *any* buyer, that would *not* be a proper instruction; I think in this case the court can look at those issues; and there's been a lot of testimony about who did what when and who suggested what when, and all of those items I think are properly considered by the jury.

(emphasis added).

¶86.    Based on a thorough reading of the record, Mercury's argument on this point is without  merit. Based on the evidence and the court's appropriate instructions, the jury awarded Travis $30,000 in damages.   And this award is entirely supported by the law and evidence.

V.

*Mercury's Motion for a Directed Verdict was properly denied.*

¶87.    Mercury argues that "[T]here should have been no jury issue on whether there was a breach of warranty or whether the Plaintiff was entitled to damages.  Mercury was entitled to a directed verdict on the issue of liability and damages."   Mercury was not so entitled. The record amply supports the jury's finding for Travis; and the law supports it.  Thus, denying the directed verdict motion was not in error.

¶88.    The majority belies the realities and often unique circumstances of sales transactions, and the teachings of the Uniform Commercial Code, and is yet another example of the kind of analysis coming from this Court that ranks our legal aptitude among the embarrassing.   Mercury's express warranty failed of its

36

essential purpose because it deprived Travis of the benefit of his bargain.  Mercury also breached its implied warranties of merchantability and fitness for a particular purpose.  The motors were defective *before* they were even installed.  They broke down consistently, if not one, then the other, then the other one, and then the one before.  Moreover, if Travis wanted a motors warranted strictly to "propel him through the water,"as Mercury insisted at trial,  with no particular assurance as to the name and quality and reliability of tested high performance motors used time and again for competitions, one must question whether Travis would have bargained with Mercury at all.   As to Mercury's right to cure, under  the facts of this case, reasonable people, applying the correct legal standards, decided that Mercury was given a reasonable opportunity to cure and failed to do so. As a direct result, Travis incurred direct, consequential, and incidental damages for which he is entitled compensation under the law.  The jury's award should be affirmed.  Since it was not, I dissent.

**DIAZ AND EASLEY, JJ., JOINS THIS OPINION.**